UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

RESQNET.COM, INC.,

                    Plaintiff,                    01 Civ. 3578 (RWS)

     - against -

                                                  O P I N I O N

LANSA, INC.,

                    Defendant.

-----------------------------------------X

A P P E A R A N C E S:

          Attorneys for Plaintiff

          KAPLAN GILMAN GIBSON & DERNIER LLP
          900 Route 9 North
          Woodbridge, NJ 07095
          By:  Jeffrey I. Kaplan, Esq.


          Attorneys for Defendant

          ARENT FOX LLP
          1050 Connecticut Avenue, N.W.
          Washington, D.C.  20036
          By:  James H. Hulme, Esq.
               Janine A. Carlan, Esq.

          ARENT FOX LLP
          1675 Broadway
          New York, NY 10019
          By:  Steven Kimelman, Esq.
               David N. Wynn, Esq.

1

**Sweet, D.J.,**

Upon all the proceedings had heretofore and upon the following findings of fact and conclusions of law, judgment will be entered in favor of defendant Lansa, Inc. ("Lansa" or the "Defendant") as to U.S. Patent No. 5,831,608 (the "'608 Patent") and in favor of plaintiff ResQNet.com, Inc. ("ResQNet" or the "Plaintiff") as to U.S. Patent No. 6,295,075 (the "'075 Patent").

## Prior Proceedings

By a complaint filed on April 27, 2001 and an amended complaint filed on December 4, 2001, ResQNet alleged that Lansa's product "NewLook" infringed one or more claims of five U.S. patents, the '608 Patent, the '075 Patent, and U.S Patent Nos. 5,530,961 (the "'961 Patent"), 5,792,659 (the "'659 Patent"), and 5,812,127 (the "'127 Patent"). ResQNet subsequently withdrew its allegations of infringement concerning the '659 Patent and the '127 Patent.

After holding a hearing pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), the Court interpreted the language of the '608 Patent, the '075 Patent,

and the '961 Patent in an Opinion dated September 5, 2002. See
ResQNet.com, Inc. v. Lansa, Inc., No. 01 Civ. 3578 (RWS), 2002
U.S. Dist. LEXIS 16667 (S.D.N.Y. Sept. 5, 2002) ("ResQNet I").

Based upon the Court's claims contruction in ResQNet
I, the parties stipulated to final judgment in Lansa's favor
with respect to all three patents then in the suit. ResQNet's
claims were dismissed with prejudice, with ResQNet's consent, by
final judgment entered by this Court on November 4, 2002.

On appeal, the Federal Circuit affirmed in part and
reversed in part the claim construction ruling in ResQNet I, and
remanded for further proceedings. See ResQNet.com, Inc. v.
Lansa, Inc., 346 F.3d 1374 (Fed. Cir. 2003) ("ResQNet II").
Based upon the stipulated final judgment entered in November
2002, and the Federal Circuit's affirmance of this Court's claim
construction ruling on the '961 patent, only the '075 and '608
patents remained on remand in October 2003.

By an Opinion dated January 13, 2005, the Court denied
the parties' motions for partial summary judgment, Plaintiff's
motion to strike Defendant's invalidity defense as to the '075
Patent, and Plaintiff's motion for sanctions, granted
Plaintiff's motion for leave to file a sur-reply and Defendant's

3

motion for leave to amend its answer and counterclaims, and granted in part Defendant's motion for sanctions. See ResQNet.com, Inc. v. Lansa, Inc., 382 F. Supp. 2d 424 (S.D.N.Y. 2005) ("ResQNet III").

The parties then moved for partial summary judgment on the issue of ResQNet's alleged inequitable conduct in the prosecution of the '075 Patent. By an Opinion dated November 22, 2006, the Court granted summary judgment in favor of ResQNet on this issue. See ResQNet.com, Inc. v. Lansa, Inc., No. 01 Civ. 3578 (RWS), 2006 U.S. Dist. LEXIS 85613 (S.D.N.Y. Nov. 22, 2006) ("ResQNet IV").

A bench trial was held from May 21, 2007 to May 24, 2007 and post-trial memoranda were submitted up to and including August 29, 2007.

Lansa filed a motion to strike Plaintiff's exhibit 5A on October 26, 2007, which the Court denied on December 3, 2007.

The only remaining patent claims at issue are claim 1 of the '608 Patent and claim 1 of the '075 Patent. (Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" ¶ 2).

**Findings of Fact**

*A. Background*

In ResQNet II, the Federal Circuit summarized the
subject matter of the patent claims at issue in this action:

> The three patents-in-suit claim, in relevant
> part, "screen recognition" and terminal emulation –
> processes that download a screen of information from a
> remote mainframe computer onto a local personal
> computer (PC). Mainframe computers permit multiple
> users to simultaneously access one central computer.
> Before the widespread use of PCs, each user would
> connect to the mainframe using a so-called "dumb
> terminal." A dumb terminal typically included a
> monitor for displaying text and a keyboard for data
> entry. A dumb terminal, as its name implies, did not
> process or reformat the data received from the
> mainframe. Rather, the dumb terminal simply displayed
> the information from the mainframe. Symmetrically, the
> dumb terminal sent all data entry back to the
> mainframe for processing. Because a dumb terminal's
> monitor generally was a monochromatic green, the
> display was called a "green screen."
>
> Gradually, PCs replaced dumb terminals. Unlike a
> dumb terminal, a PC does not merely send and receive
> information. Rather, a PC uses software to facilitate
> communication to and from the mainframe. With that
> software, a PC does not simply mimic a dumb terminal,
> but processes the information into a graphical user
> interface (GUI) format, which is much more user-
> friendly. Although the GUI format displays and
> receives information to and from the user, the PC
> still sends and receives information only in the
> manner understood by the mainframe, i.e., as if a dumb
> terminal were connected to the mainframe. In relevant
> part, the asserted patents specifically facilitate

recognition of the information that the mainframe sends to the PC.

Resqnet II, 346 F.3d at 1375-1376.

*B. The '608 Patent*

The '608 Patent is entitled "User Interface for a Remote Terminal" and was filed on March 30, 1996. (Defendant's Trial Exhibit ("DTX") 7).

The '608 Patent is a continuation-in-part of the '961 Patent. (Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" ¶ 5).

Claim 1 of the '608 Patent is a "means plus function claim" with two of its limitations in means-plus-function format:

Apparatus for implementing a computer terminal to be connected to a remote computer, said apparatus comprising:

means for identifying a particular user logged on to said remote computer through said computer terminal;

means for identifying, based upon a position, length and type of each of a plurality of fields, a particular screen to be displayed to said user; and

6

a plurality of special function keys, each key performing a specified function, the specified function performed for each key being determined by the particular user logged on and the particular screen identified to be displayed.

('608 Patent, col. 4); see also ResQNet III, 382 F. Supp. 2d at 429.

The first element in claim 1 of the '608 Patent, "means for identifying a particular user logged on to said remote computer through said computer terminal," identifies the user who is using the particular screen by identifying the log-in screen as such and then identifying the field where the log-in is entered. (DTX 106; Yampel Dep. 46-47). "The claimed function is identifying a particular user logged on." ('608 Patent, col. 4). This element describes an algorithm and also refers to the services delivered to different users. (DTX 106; Yampel Dep. 48) ("[O]nce we know who the user is we might produce a different customized screen or the same screen.").

The second element in claim 1 of the '608 Patent has a function of "identifying . . . a particular screen to be displayed to said user" and the corresponding structure is an algorithm for analyzing the downloaded information to generate a screen ID. ResQNet III, 382 F. Supp. 2d at 430; ('608 Patent,

col. 4; Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" ¶ 6).

A "screen ID," as used in this Court's prior interpretation of the '961 Patent, "refers to a number." ResQNet I, 2002 U.S. Dist. LEXIS 16667, at *28.

The algorithm of claim 1 of the '608 Patent "is dependent on three parameters for identifying a screen: position, length, and type." ResQNet I, 2002 U.S. Dist. LEXIS 16667, at *20; (Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" ¶ 8).

The third element of claim 1 of the '608 patent describes customization of special function keys based upon the user who is logged on. ('608 Patent, Col. 4; PTX 22, July 20, 2004 Report ¶ 32, Trial Tr. 505). Special function keys are those keys that the legacy applications (i.e., those applications that generate the green screens) employed, having names like system requests, function key 1, attention keys, clear keys. The special function keys are reflected on a keyboard, and can be something like the PF1 key. (DTX 106; Yampel Dep. 50).

*C. The '075 Patent*

The '075 Patent is titled "Configurable terminal capable of communicating with various remote computers" and was filed on July 10, 1997. (DTX 9).

Claim 1 of the '075 Patent is a pure method claim as follows:

The method of communicating between a host computer and a remote terminal over a data network comprising steps of:

establishing a first communication session between said terminal and a communications server via a first communications channel;

downloading, from said server to said terminal, communications software for communicating between said terminal and said host and a plurality of specific screen identifying information;

utilizing said communications software to implement a second communications session between said terminal and said host via a second communications channel independent of said server;

receiving a screen from said host to said terminal;

if said received screen matches one of the plurality of specific screen identifying information, displaying a customized GUI [Graphical User Interface] screen; and

if said received screen does not match one of the plurality of specific screen identifying information, displaying a default GUI screen.

('075 Patent, cols. 4-5.) See also ResQNet III, 382 F. Supp. 2d at 430-431.

In claim 1 of the '075 Patent, "a plurality of specific screen identifying information" means "at least two pieces of specific screen identifying information." (Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" ¶ 10).

Claim 1 of the '075 patent requires an algorithm that recognizes the screen based on the information downloaded from the mainframe. See ResQNet II, 346 F.3d at 1383-84. Those screens of information are then displayed by the terminal as a customized Graphical User Interface ("GUI") or a non-customized default GUI, depending upon whether there is a match between the specific screen identifying information previously downloaded from the server and the screen information received by the terminal from the host. ('075 Patent).

The critical date for purposes of 35 U.S.C. § 102(b) for the '075 Patent is July 10, 1996, one year prior to the filing date of the '075 Patent. ResQNet III, 382 F. Supp. 2d at 435.

10

*D. The NewLook Software*

The NewLook software was developed by Looksoftware Proprietary Limited ("Looksoftware"), an Australian company. (Trial Tr. 277). The product was to be used with an "AS/400," a midrange computer used in small to medium businesses to run business-type applications. (Trial Tr. 280).

When NewLook was first developed, the midrange computers in 1995 often ran applications that used a "green screen" interface. (Trial Tr. 281, 441).

The developers of NewLook started working on the software in early 1995, and worked on the product throughout the year, with full-time work on the program commencing in the latter half of 1995. (Trial Tr. 284).

Looksoftware sought to develop a product that created a GUI using a so-called "dynamic architecture," where the software would automatically convert "green screens" to GUI screens without using a table lookup or otherwise recognizing the actual screen being displayed. (Trial Tr. 279, 283, 286).

11

Other products for creating GUIs on the market require purchasers to look at a green screen in advance, create an identification for the screen, and have a GUI created externally that represented that screen. When these other products were running, the software would recognize the green screen, look up in a table the appropriate GUI associated with that screen, and then present the proper GUI. (Trial Tr. 298).

The standard edition of NewLook is what an end-user of NewLook would use on a personal computer, typically used by an employee of a business running an AS/400 application. (Trial Tr. 286-87; DTX 67 at LAN 159).

The developer or professional edition of NewLook is used by a programmer (developer) at a company. (Trial Tr. 287; DTX 67 at LAN 159). A developer or programmer using the developer edition of NewLook can create overrides to elements if he or she decides that the automatic changes to a certain element are not how the company wants that element to be displayed. (Trial Tr. 300).

The term "Identify" in NewLook refers to identifying specific elements on a screen. (Trial Tr. 302). The developer

12

(but not the user) can use the Identify tool to apply overrides. (Trial Tr. 302).

In NewLook, a "screen ID" (hereafter termed a "NewLook Screen ID") is a piece of text generated by the developer that tells the program to apply an override. A NewLook Screen ID is picked by the developer. (Trial Tr. 303). A NewLook Screen ID does not necessarily identify a particular screen and can be present on multiple screens or none at all. (Trial Tr. 303-04). A developer can use the Identify tool to make changes to a single screen. (Trial Tr. 383-91; Plaintiff's Trial Exhibit ("PTX") 5 at LAN 170, LAN 171, 715).

NewLook uses "filters" to make global changes. When a filter is defined, it applies across all screens. (Trial Tr. 310).

NewLook was advertised as early as March 1996. In one of the first promotions, Looksoftware actually included executable software on a disk in the advertisement. (Trial Tr. 452; DTX 35). The first sale of NewLook was on March 8, 1996 to Aspect Computing of Australia. (Trial Tr. 278, 284; DTX 63).

13

The testimony and documentary evidence admitted at trial demonstrates that the version of NewLook on sale prior to the critical date ("NewLook version 1.0") lacked a built-in terminal emulator, and instead relied on third-party emulator software to function. (DTX 64 at 10; DTX 68 at 4; Trial Tr. 431, 462).

In March 1996, NewLook was operable with the versions of Windows that were available at the time: Windows 3.x, Windows 95, and Windows NT. NewLook worked with networked computers at the time. (Trial Tr. 357-9; DTX 68; DTX 69).

Today, NewLook has other features not related to GUI, such as web services, and remote program calls. (Trial Tr. 288).

**Conclusions of Law**

*A. NewLook Does Not Infringe the '608 Patent*

To succeed on an infringement claim, the patentee must demonstrate that the accused product contains each and every limitation of the properly construed claim. See Lemelson v. United States, 752 F.2d 1538, 1551 (Fed. Cir. 1985). "[E]ach

14

element of a claim is material and essential," and the absence of any one must result in a finding of no infringement. Id. It is the patentee's burden to prove infringement, whether literal or by the doctrine of equivalents, by a preponderance of the evidence. Id. at 1547.

ResQNet has asserted that Lansa directly infringes the '608 Patent under 35 U.S.C. § 271(a). That statutes states: "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).

Claim 1 of the '608 Patent contains elements in a mean-plus-function format. ResQNet II, 346 F.3d at 1382. To show infringement, it is ResQNet's burden to prove that it is more likely than not that NewLook (1) contains a structure that performs the identical function to the function recited in the means-plus-function limitation; and (2) that the structure of NewLook that performs that function is either identical or equivalent to the corresponding structure disclosed in the patent specification. See Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1266-68 (Fed. Cir. 1999).

15

The first element in claim 1 of the '608 Patent, a "means for identifying a particular user logged on to said remote computer through said computer terminal," requires that the product "identify[] a particular user logged on." ('608 Patent, col. 4).

The second element in claim 1 of the '608 Patent has a function of "identifying . . . a particular screen to be displayed to said user." ('608 Patent, col. 4; Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" ¶ 6).

The third element of claim 1 of the '608 Patent describes customization of special function keys based upon the user who is logged on and the particular screen being displayed. ('608 Patent, Col. 4; PTX 22, July 20, 2004 Report ¶ 32; Trial Tr. 505).

With regard to the first element of this claim, Looksoftware Director of Development Brendan Kay ("Kay") testified that NewLook "doesn't keep track of the user logged on or make any attempt to do so." (Trial Tr. 372-73). Indeed, no

16

evidence was presented that NewLook requires a user login or password.

Plaintiff's expert, Dr. Eric Dowling ("Dr. Dowling") testified that NewLook recognizes users not through an individualized login, but rather via the computer through which the user logs in. (Trial Tr. 161-62; PTX 7, Appendix III at 1-5 (characterizing this recognition mechanism as a "user machine basis as opposed to a user-independent-of-machine-basis.")).

However, this PC-as-user conception is inconsistent with the language of the '608 Patent. The specification states that the invention seeks to allow "each user to customize . . . based upon his own personal preference and the particular terminal used . . . ." ('608 Patent, col. 2). Yet if a user is defined solely by the terminal at which he sits, the two categories of customization sought by the patent ("his own personal preference" and "the particular terminal used") would be exactly the same. The first element of claim 1, a "means for identifying a particular user logged on to said remote computer through said computer terminal" (emphasis added), further supports the notion of user and terminal as two distinct concepts. ('608 Patent, col. 4). Furthermore, the '608 Patent specification notes that part of the purpose of the patent is to

17

satisfy the "wish" or "desire" of "users" to customize his or
her user interface, such wishes or desires capable of being held
only by persons, not computer terminals. ('608 Patent, col. 1).

In addition, NewLook does not contain the third
element of the '608 Patent's Claim 1. Plaintiff has pointed to
two Lansa documents and the deposition testimony of Lansa Senior
Product Specialist Eamon Musallam ("Musallam") as establishing
the proposition that NewLook allows function keys to be mapped
by user and the particular screen displayed.

Lansa documents state that "[i]f authorized, business
users may tailor to suit individual preferences," (PTX 5 at LAN
096), and "[k]eyboard remapping to corporate standards or
personal preference readily accommodated," (PTX 5 at 0735).
When asked at his deposition whether end users can remap their
keyboards, Musallam stated that "I would say that the end user
has an option or the developer has an option to allow the end
user to do some basic keyboard mapping." (Musallam Dep. 44-45).
Musallam also answered affirmatively when asked, "[i]n the same
application but for different screens of information, could a
single function key have different functions?" (Musallam Dep.
49).

However, even accepting ResQNet's interpretation of Musallam's testimony, the evidence shows that NewLook lacks the ability to map key function to specific screens. Musallam clarified at trial his deposition testimony, noting that the ability to map function keys by screen would come from the green screen application, not from NewLook. (Trial Tr. 446). To the extent NewLook allows function key remapping, changes apply to all screens globally. (Trial Tr. 368, 444; PTX 21 at LAN 7541).

As discussed more fully in the next section, a developer can use NewLook's Identify tool to identify a particular screen by picking a NewLook Screen ID that appears on only one screen.[1] However, there is no evidence that NewLook gives the developer the ability to remap the function keys for a particular screen chosen with the Identify tool.

*B. NewLook Directly Infringes the '075 Patent*

To prove direct infringement, ResQNet must establish by a preponderance of the evidence that "every limitation set forth in the asserted claim is found in the accused product,

---

[1] While the very name of the term "screen ID" may appear to connote identification of individual screens, the record is clear that a NewLook Screen ID is actually a search string, chosen by the developer, not an output of an algorithm designed to identify unique screens. (Trial Tr. 303-04).

either literally or by a substantial equivalent." Wolverine World Wide, Inc. v. Nike, Inc., 38 F.3d 1192, 1196 (Fed. Cir. 1994).

Under the preferred embodiment of the '075 Patent,

the P[ersonal] C[omputer] employs an algorithm -- that is not limited to but may be of the type described in the '961 Patent -- to generate a unique screen ID for each screen of information downloaded from the mainframe. The generated screen ID is then compared with a table of screen IDs that has been previously downloaded from a communications server in order to determine the appropriate customized GUI screen. If the table downloaded from the communications server does not contain a match for the generated screen ID, a default GUI screen is displayed.

ResQNet IV, 2006 U.S. Dist. LEXIS 85613, at *6-7 (citing '075 Patent, col. 3-4).

While the preferred embodiment specifies a particular mode of implementing claim 1 of the '075 Patent, it is the claim itself, as construed by ResQNet I and ResQNet II, that must guide the Court in determining whether NewLook infringes the '075 Patent. See Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1326 (Fed. Cir. 2002) ("That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims.") (quoting Raytheon Co. v. Roper Corp., 724 F.2d 951,

957 (Fed. Cir. 1983)); see also ResQNet II, 346 F.3d at 1383 ("The particular screen recognition algorithm used is not critical . . . .") (quoting '075 Patent, col. 4).

NewLook contains each of the elements of Claim 1. First, the claim charts "[t]he method of communicating between a host computer and a remote terminal over a data network . . . ." ('075 Patent, col. 4). NewLook is designed to run with an AS/400 host computer and end user terminal. (PTX 5 at 192, 496).

The first element of Claim 1 is "establishing a first communication session between said terminal and a communications server via a first communications channel." ('075 Patent, col. 5). The evidence demonstrates that PCs running NewLook connect to a server. (PTX 5 at 163, 494, 731).

The second element of Claim 1 is "downloading, from said server to said terminal, communications software for communicating between said terminal and said host and a plurality of specific screen identifying information." ('075 Patent, col. 5). The overrides selected by the developer -- including the NewLook Screen IDs chosen by the developer for use with the Identify tool -- are stored on the server in the "SID

21

file" or "dynamic design repository." (Trial Tr. 301-02). The evidence demonstrates that running NewLook enables PCs to download communications software and the SID file from the server. (PTX 4 at 146-47; PTX 5A LAN 496-97; Trial Tr. 71-72). Further, the NewLook Screen IDs chosen by the developer and contained in the SID file are "sensitive to row/column positions." (PTX 5 at LAN 170). If used to identify unique screens in the manner discussed below, the SID file contains "at least two pieces of specific screen identifying information." (Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" ¶ 10) (defining "a plurality of specific screen identifying information").

The third element of Claim 1 is "utilizing said communications software to implement a second communications session between said terminal and said host via a second communications channel independent of said server." ('075 Patent, col. 5). The evidence demonstrates that NewLook includes a terminal emulator[2] and may be set up using a network installation, where the software initiates a second communications session with the host via a 5250 datastream.

---

[2] "[A] terminal emulator . . . allows a PC, or a computer, to emulate the functions of what used to be called before a hard-wired terminal. There were hard-wired terminals that connected directly into the . . . host computer. And that capability now is emulated on a PC." (Trial Tr. 70).

22

(PTX 4 at 146-47; PTX 5A LAN 496-97; PTX 21 at LAN 6131; Trial Tr. 71-72, 128-30).

The fourth element of Claim 1 is "receiving a screen from said host to said terminal." ('075 Patent, col. 5). NewLook is designed to facilitate the receipt of such green screens. (PTX 5 at LAN 18).

The fifth and sixth elements of Claim 1 are

if said received screen matches one of the plurality of specific screen identifying information, displaying a customized GUI screen; and

if said received screen does not match one of the plurality of specific screen identifying information, displaying a default GUI screen.

('075 Patent, col. 5). These elements require an algorithm that recognizes the screen based on the information downloaded from the mainframe. See ResQNet II, 346 F.3d at 1383-84.

As discussed above, NewLook's dynamic architecture automatically generates a GUI, or "best guess" for each incoming screen. (PTX 3 at 60-61). Absent any overrides pre-programmed by the developer, for each green screen downloaded, NewLook will display only this "default GUI." (PTX 4 at 113-14).

However, a developer can use NewLook's Identify tool to override the default GUI automatically generated by NewLook's dynamic recognition engine. (Trial Tr. 303). To do so, the developer selects a trigger text (a NewLook Screen ID) and a desired action to be taken if the trigger text is found; NewLook searches each green screen as it is downloaded from the mainframe for the NewLook Screen ID and performs the specified action if the NewLook Screen ID is found. (DTX 64 at 6; Trail Tr. 302-07).

A developer can use the Identify tool to make changes to a single screen by selecting a NewLook Screen ID that is unique to only that screen. (Trial Tr. 383-91; PTX 5 at LAN 170, LAN 171, 715). Furthermore, the evidence demonstrates that the makers of NewLook encouraged developers to use the Identify tool as a way of uniquely identifying a screen. (PTX 5 at 715).

After a developer has identified a NewLook Screen ID, NewLook employs a process whereby the program will check each green screen downloaded for the presence of each NewLook Screen ID in a step-by-step fashion. As described by Kay,

> [NewLook] goes in for each [override] to see should I make the changes that this override specifies. If it doesn't [find that the override

applies to the green screen], it moves on to the next one. If it [finds that the override applies to the green screen], it makes the changes and then moves on to the next one.

. . .

For each override, [NewLook] is going through and seeing whether the information just received from the AS/400 computer contains the trigger text, the [NewLook] [S]creen ID, for each override. If it does, [NewLook] applies the changes.

(Trial Tr. 377-78).

This iterative process of examining the downloaded green screen for each NewLook Screen ID, one-by-one, to determine whether an override should be implemented constitutes a "step-by-step problem-solving procedure, especially an established, recursive computational procedure for solving a problem in a finite number of steps." ResQNet I, 2002 U.S. Dist. LEXIS, at *25 n.3 (defining "algorithm").

The NewLook software and accompanying instructional material provide a method for accomplishing each element of Claim 1 of the '075 Patent.[3] Accordingly, NewLook directly infringes the '075 Patent.

_____

[3] Though the Identify tool does not assign each green screen a unique number (or a "screen ID," as defined in ResQNet I, 2002 U.S. Dist. LEXIS 16667, at *28, and included in the '961 Patent), ResQNet II made clear that infringement of

25

*C. NewLook Indirectly Infringes the '075 Patent*

To establish indirect infringement, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990).

No direct evidence of infringement by any third party was presented by ResQNet. However, indirect infringement can be proved through circumstantial evidence. See Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986). In Moleculon, the relevant claim was construed as "a method for restoring a 2 x 2 x 2 composite cube." Id. The Federal Circuit affirmed the district court's conclusion that the plaintiff had proved infringing acts through "circumstantial evidence of

---

the '075 Patent does not require use of the method of the '961 Patent:

Even though the '961, '608, and '075 patents claim similar (but not the same) subject matter, the '075 patent does not share the genealogy of the other two patents. . . . [T]his court detects no reason to construe the '075 claims as identical to similar claim terms in the other two patents.

ResQNet II, 346 F.3d at 1383.

extensive puzzle sales, dissemination of an instruction sheet
teaching the method of restoring the preselected pattern with
each puzzle, and the availability of a solution booklet on how
to solve the puzzle." Id.

As in Moleculon, there exists substantial
circumstantial evidence that third parties used NewLook in
manner that would infringe. NewLook's online help system
provided instructions to developers for using the Identify tool
to uniquely identify a particular screen. (PTX 5 at 715). The
NewLook Getting Started Guide specifically instructed developers
on how to use overrides to generate a customized GUI for
individual screens. (PTX 5 at LAN 171). In fact, NewLook
generates an error message if a NewLook Screen ID applies to
more than one green screen, further evidence that the software
is intended to allow developers to identify particular screens.
(PTX 5A at 716, 726).

Accordingly, ResQNet has carried its burden of
demonstrating infringing acts sufficient to establish indirect
infringement of the '075 Patent, and knowledge on the part of
Lansa of such acts. See Manville, 917 F.2d at 553; Moleculon,
793 F.2d at 1272; see also Mickowski v. Visi-Trak Corp., 36 F.
Supp. 2d 171, 175, 180 (S.D.N.Y. 1999) (finding inducement,

despite non-infringing uses, because written documentation distributed with computer product showed how to practice the patented method).

D. *The Sale of NewLook Version 1.0 Prior to the '075 Patent's Critical Date Does Not Invalidate the '075 Patent*

Persons are not entitled to patents if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ." 35 U.S.C. § 102(b).

A patent claim is invalid if an embodiment of the claimed invention was both (1) subject to commercial offer for sale in the United States; and (2) ready for patenting more than one year before the patent application date. See Pfaff v. Wells Elecs., 525 U.S. 55, 67-68 (1998). The party asserting the bar bears the burden of demonstrating its application by clear and convincing evidence. See Ferag AG v. Quipp Inc., 45 F.3d 1562, 1566 (Fed. Cir. 1995).

An invention was "on sale" if the claimed invention was embodied in the thing sold or commercially offered for sale.

28

See Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1046-47 (Fed. Cir. 2001). It is not required that a sale was actually made; the essential question is whether or not there was an attempt to obtain commercial benefit. See id. The claimed invention is ready for patenting when there is reason to believe it would work for its intended purpose. See Evans Cooling Sys., Inc. v. General Motors Corp., 125 F.3d 1448, 1450 (Fed. Cir. 1997).

The evidence establishes that NewLook version 1.0 was placed on sale in the United States prior to the '075 Patent critical date of July 10, 1996: Look Software offered NewLook version 1.0 for sale to Specialty Software on June 24, 1996. (DTX 64 at 1; Trial Tr. 456).

The only area of disagreement is whether NewLook version 1.0 is an embodiment of the '075 Patent. Lansa has failed to show by clear and convincing evidence that NewLook version 1.0 contained two elements of Claim 1: communications software and an ability to function with a host and server.

The phrase "communications software" was not construed in either ResQNet I or ResQNet II. Plaintiff's expert witness, Dr. Dowling, interpreted "communications software" to mean

29

"communication software that is used for subsequent communication between the terminal and the host." (PTX 7, Appendix IV at 2). Lansa's expert witness, Charles Gibson ("Dr. Gibson"), testified that "communications software" refers to "downloading the program from the server along with some of the files." (Trial Tr. 512).

The evidence that NewLook version 1.0 contained "communications software" or could facilitate communication between the host and server is scant. The NewLook version 1.0 help manual, which was prepared in February or March 1996, states that "[i]f you are on a network, your users just need access to the NewLook and application directory containing any NL files." (DTX 68 at 3; Trial Tr. 357-59, 462). A marketing solicitation dated June 24, 1996, stated that NewLook "analys[es] the data stream, typically via call to the emulator's HLLAPI application programming interface," demonstrating communication between the program and the client's emulator. (DTX 64 at 9). Kay testified that NewLook version 1.0 had "the communications," but did not specify what that meant. (Trial Tr. 432). Marcus Dee ("Dee"), managing director of Looksoftware, testified that NewLook version 1.0 lacked an emulator but could download third-party emulator software from a server. (Trial Tr. 475-76).

In light of the evidence that NewLook version 1.0 lacked emulation software, Lansa has failed to clearly and convincingly demonstrate that that version had the communications software that is part of Claim 1 of the '075 Patent. Accordingly, the '075 Patent is not invalid due to the on-sale bar. See Pfaff, 525 U.S. at 67-68.

*E.    The '075 Patent is Not Invalid For Obviousness*

A patent is invalid for obviousness under 35 U.S.C. § 103 where the claimed subject matter would have been obvious to one of ordinary skill in the art at the time the invention was made. See KSR Int'l Co. v. Teleflex Inc., ___ U.S. ___, 127 S. Ct. 1727, 1734 (2007).

To find obviousness, a person of ordinary skill in the art may combine two or more items of prior art. The Court will determine the following factual matters, each of which must be established by clear and convincing evidence to establish obviousness:

a.    The scope and content of the prior art relied upon;
b.    The difference or differences, if any, between claim 1 and the prior art;

c.  The level of ordinary skill in the art at the time the invention of the '075 Patent was made; and
d.  Objective factors indicating non-obviousness.

See id.

A patent is rendered invalid where the claimed invention was described in a "printed publication" before the critical date. Astrazeneca AB v. Mylan Labs., Inc. (In re Omeprazole Patent Litig.), 490 F. Supp. 2d 381, 510 (S.D.N.Y. 2007); 35 U.S.C. § 102(b).

Lansa has claimed that the '075 Patent is invalid as obvious in light of the prior art. Specifically, Lansa witness Gibson testified that the instruction manual for "Flashpoint" software teaches GUI customization based on screen recognition, the heart of claim 1 of the '075 Patent. (Lansa Proposed Findings of Fact and Conclusions of Law, at 61; Trial Tr. 502-03; DTX 25).

To qualify as a "printed publication" under 35 U.S.C. § 102(b), a prior art reference "must have placed the claimed invention 'in the possession of the public' more than one year before the date of the patent application." In re Omeprazole, 490 F. Supp. 2d at 510 (quoting Eli Lilly & Co. v. Zenith

Goldline Pharms. Inc., 471 F.3d 1369, 1375 (Fed. Cir. 2006)).
The party seeking to introduce the reference "should produce
sufficient proof of its dissemination or that it has otherwise
been available and accessible to persons concerned with the art
to which the document relates and thus most likely to avail
themselves of its contents." In re Wyer, 655 F.2d 221, 227
(C.C.P.A. 1981).

Here, the only evidence that the Flashpoint references
were in the public possession prior to the critical date were
the dates on the documents themselves. DTX 25, entitled
"Flashpoint: The first step to cooperative processing" appears
to be a user manual and bears the date of October 1991 on its
first page, page 1342. DTX 26,[4] entitled "Flashpoint Tutorial,"
on page ZEP 1090, bears a copyright date of 1993 and an apparent
date marking of "JAN93." However, no witness testified, nor was
any evidence presented, that either of these documents was ever
published or disseminated to the public. Indeed, DTX 26
expressly notes that the manual is "an unpublished work and is
considered a trade secret belonging to the copyright holder."
DTX 26 at ZEP 1090.

---

[4] DTX 26 was not admitted into evidence itself, however it was
contained within DTX 11, which was admitted.

33

In the absence of any evidence that the Flashpoint references were published prior to the critical date, Flashpoint cannot be considered prior art for the purposes of invalidating the '075 Patent. See Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1330 (Fed. Cir. 2004) (affirming district court finding that publication was not established in the absence of specific evidence of actual availability and despite testimony that "general practice" was to make such documents available); In re Omeprazole, 490 F. Supp. 2d at 519-21 (finding date on document, citation by European Patent Office, and "scant testimony" insufficient evidence of publication on successive documents); AT&T Corp. v. Microsoft Corp., No. 01 Civ. 4872 (WHP), 2004 U.S. Dist. LEXIS 2192, at *21 (S.D.N.Y. Feb. 17, 2004) (finding expert declaration that document in question was almost certainly disseminated insufficient to demonstrate publication).[5]

Disregarding Flashpoint as prior art for purposes of invalidation of the '075 Patent, no evidence was presented that

---

[5] Lansa has argued that ResQNet's submission of Flashpoint references in an Information Disclosure Statement ("IDS") during the reexamination of the '961 Patent on May 1, 2002 constituted an admission that Flashpoint was publicly disseminated. However, "mere submission of an IDS to the USPTO does not constitute the patent applicant's admission that any reference in the IDS is material prior art." Abbott Labs. v. Baxter Pharm. Prods., 334 F.3d 1274, 1279 (Fed. Cir. 2003); accord 37 C.F.R. § 1.97(h) (2006). Furthermore, ResQNet's submission in 2002 does not speak to Flashpoint's dissemination prior to the '075 Patent's critical date of July 10, 1996.

34

any prior art disclosed the fifth and sixth elements of Claim 1, i.e., screen identification and display of customized GUI. Accordingly, Lansa has failed to meet its burden of demonstrating obviousness by clear and convincing evidence. See KSR, 127 S. Ct. at 1734.

F.  *The '075 Patent is not Invalid for Lack of Operability or Enablement*

A patent that claims an impossible invention fails to meet the utility requirement of 35 U.S.C. §§ 101 and 112 and is invalid for lack of operability. See Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1571 (Fed. Cir. 1992). "To violate § 101 the claimed device must be totally incapable of achieving a useful result." Id.

Lansa has claimed that the '075 Patent is inoperable for recognizing particular screens because it calls for matching to a "plurality of specific screen identifying information," rather than all screen identifying information. ('075 Patent, col. 5). Lansa is correct that it is possible that the invention described in the '075 Patent would fail to identify a unique screen in the event that screen identifying information outside the invention's purview were altered. However, an

invention need not solve every problem identified in the prior art. See Resonate Inc. v. Alteon Websystems, Inc., 338 F.3d 1360, 1367 (Fed. Cir. 2003) (citing Honeywell, Inc. v. Victor Co. of Japan, 298 F.3d 1317 (Fed. Cir. 2002)). Lansa has not demonstrated that the invention described in the '075 Patent is "totally incapable" of recognizing unique screens, and thus has failed in its burden of showing inoperability. Brooktree, 977 F.2d at 1571.

"To be enabling under § 112, a patent must contain a description that enables one skilled in the art to make and use the claimed invention." Atlas Powder Co. v. E. I. du Pont de Nemours & Co., 750 F.2d 1569, 1576 (Fed. Cir. 1984). Lansa has argued that the '075 Patent is unenabled because the specification does not explain how to generate a default GUI. The specification states that "if the list of screen IDs previously downloaded . . . does not contain the ID granted, then a default GUI screen is presented. . . . The default screen may be of any type desired by the user." ('075 Patent, col. 4).

Lansa's only evidence to support lack of enablement is the testimony and report of Gibson, who went on to opine that the concept of default GUI generation was known in the prior art and "obvious to those skilled in the art." (PTX 22, July 20,

2004 Report ¶¶ 56-57). When, as here, the only evidence tends to undermine the claim, the party asserting lack of enablement has failed to provide clear and convincing evidence of facts establishing lack of enablement. See Johns Hopkins Univ. v. Cellpro, Inc., 152 F.3d 1342, 1359 (Fed. Cir. 1998).

**Damages**

*A. ResQNet is Entitled to Compensatory Damages*

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Deciding how much to award as damages is not an exact science, and the methodology of assessing and computing damages is committed to the sound discretion of the district court." State Indus., Inc. v. Mor-Flo Indus., Inc. 883 F.2d 1573, 1576-77 (Fed. Cir. 1989).

The parties appear to agree that the appropriate method of calculating damages is to determine the reasonable royalty, since lost profits cannot be proved.

In the absence of an established royalty rate, courts should determine a reasonable rate based upon the result of a hypothetical negotiation between the two parties at the time the infringement began. See Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1554 (Fed. Cir. 1995). "The key element in setting a reasonable royalty after determination of validity and infringement is the necessity for return to the date when the infringement began." Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1158 (6th Cir. 1978). To guide the royalty determination, courts typically look to the fifteen factors enumerated in Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970), modified by 446 F.2d 295 (2d Cir. 1971). These factors are:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promot[e]r.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Georgia-Pacific, 318 F. Supp. at 1120.


ResQNet offered the testimony and expert report of Dr. Jesse David ("Dr. David"), a senior consultant at the National Economic Research Associates who holds a Ph.D. in Economics from Stanford University. Lansa did not offer expert testimony on the issue of damages.


In his thorough analysis, Dr. David applied each of the Georgia-Pacific factors and concluded that an appropriate reasonable royalty rate for use of the patents-in-suit was 12.5 percent. (PTX 8, July 14, 2004 Report ("David Report"), at 13). The key factor driving Dr. David's ultimate conclusion was the first, the royalties ResQNet received for actual licenses of the patents-in-suit. (David Report, at 5-7). Of the remaining fourteen factors, Dr. David found two having an upward

influence, one a lower influence, and eleven a neutral effect. (David Report, at 13).

Without offering any expert testimony of its own, Lansa has made two primary arguments in opposition to Dr. David's rate calculation. First, many of the ResQNet licenses Dr. David used to set his baseline did not license the patents-in-suit. Second, Dr. David failed to account for other software that could be bundled with the infringing software.

The determination of the outcome of a hypothetical negotiation is by its very nature an imprecise art. However distinguishable the other ResQNet patents considered by Dr. David may be, the record reveals no other, more analogous patents to use in setting a baseline for the royalty calculation. Dr. David reached the 12.5% figure by taking into account the differences between the actual ResQNet licenses and the hypothetical license between Lansa and ResQNet. Indeed, the only calculable royalty rate below 12.5% was reached by virtue of settlement with Zephyr and without the assumption, present for the purposes of hypothetical negotiation, that the '075 Patent was valid and enforceable.[6]

---

[6] The royalty rate agreed upon in the Zephyr settlement is the subject of a protective order.

Lansa has argued that the "IBM bundled software" licensing rate of one to three percent is applicable, but has not cited any part of the record to support its contention that that license is analogous, or even that it was in fact one to three percent. (Lansa Mem. of Proposed Findings of Fact and Conclusions of Law, at 69). Moreover, Dr. David accounted for bundling as best as the record allowed by considering the "straight patent licenses" (where no code was licensed) granted to Seagull and Zephyr. (David Report, at 6-7). That Lansa itself considered both Seagull and ResQNet to be direct competitors to NewLook further supports the notion that such licenses are analogous. (PTX 21 at LAN 7539, LAN 7541; Trial Tr. 63-65).

None of the licenses considered by Dr. David is a perfect approximation of the hypothetical license between ResQNet and Lansa. The licensing agreements ResQNet reached with IBM, Hummingbird, Crystal Point, ICOM, and Ericom between 1998 and 2002 each involved licensing of ResQNet's software or code, and each involved rates higher (some substantially so) than 12.5%. (David Report, at 5-6). ResQNet's only two straight patent licenses, one of which was lower than 12.5%, were granted in the shadow of litigation, and without the

assured validity of the '075 Patent. (David Report, at 6-7).
Dr. David's conclusion that the reasonable rate lies between
these two categories' averages (and closer to the lower one) is
well-reasoned and supported in the record. In fact, by omitting
the upfront payments present in the majority of ResQNet
licenses, Dr. David's methodology is actually biased in favor of
lowering the estimated reasonable royalty. (Trial Tr. 31).

In the absence of any contrary expert testimony, and
because Lansa's criticisms of Dr. David's report are unsupported
by the evidence, 12.5% constitutes a reasonable royalty rate.

Aside from the appropriate royalty rate, the parties
disagree on the appropriate revenue amount to which the rate
should be applied.

In his initial report, Dr. David calculated Lansa's
revenue from NewLook sales for November 1998 through July 2004
to be approximately $3.3 million, with associated maintenance
fee revenue of $497,000 for the same time period. (David
Report, at 13). Dr. David obtained these numbers by
extrapolating from revenue estimates given in deposition
testimony by former Lansa employee John Nannenhorn
("Nannenhorn"). In a supplemental report prepared on January

25, 2007, Dr. David revised his estimates, based on documents received from Lansa, to arrive at software revenue of $4.0 million from November 1998 through March 2007, and maintenance revenue for the same period of $6.2 million. (PTX 8, January 25, 2007 Report ("Revised David Report"), at 2).

Lansa President John Siniscal ("Siniscal") testified that Dr. David's estimate of total maintenance fee revenue was "grossly overstated," and that the actual figure for that period was "about $2.5 million." (Trial Tr. 267). Lansa produced no evidence that Dr. David's calculations of underlying software sales were inaccurate. Instead, Lansa criticized Dr. David's methodology for failing to examine each individual invoice for NewLook sales (subsequently provided en masse to the Court by ResQNet as PTX 24 after trial without interpretation or tabulation) and for including sales to customers outside the United States. (Lansa Mem. of Proposed Findings of Fact and Conclusions of Law, at 68).

With respect to revenues from the sales of the NewLook software itself (as distinguished from NewLook maintenance fees), in the absence of any testimonial or documentary evidence presented by Lansa disputing Dr. David's estimates, the figures stated in the Revised David Report are adopted. Because NewLook

infringed only the '075 Patent, the period to which the royalty will be applied began on September 25, 2001 (the date on which the '075 Patent was granted), rather than November 3, 1998, as assumed by Dr. David. Accordingly, the total revenue for NewLook sales from September 25, 2001 through March 31, 2007 is found to be $1,893,870.[7]

There remains the question of whether any of these revenues should be excluded because they represent sales outside of the United States. "It is the general rule under United States patent law that no infringement occurs when a patented product is made and sold in another country." Microsoft Corp. v. AT&T Corp., ___ U.S. ___, 127 S. Ct. 1746, 1750 (2007). Lansa has argued that foreign sales (in Latin America, the Caribbean, and Canada) account for between ten and thirty percent of total software sales revenue. (Trial Tr. 263). Siniscal testified that its Canadian office typically handled sales within Canada, and that sales in Latin America and the Caribbean were all sold via distributors. (Trial Tr. 273-74). However, the only documentary evidence shows that sales outside

---

[7] This figure is derived from Exhibit 4 to the Revised David Report and represents the sum of product revenues for fiscal years 2003 through 2007, plus product revenue for fiscal year 2002 multiplied by the fraction (177/365), to account for the fact that Lansa's fiscal year begins in April of the previous calendar year. (Revised David Report, Ex. 4, at n.1).

45

of the United States were conducted via the Lansa main office in Chicago, contradicting Siniscal's testimony. (See, e.g., PTX 24, at 100825 (sale to Mexico), 10828 (sale to Curacao), 100874 (sale to Canada)). In Microsoft, the Court found that the plaintiff did not infringe where the items sold were copies, made abroad, of software which originated in the United States. 127 S. Ct. at 1760. Here, there is no evidence of foreign replication of the software. Instead, the software is sold as a CD-ROM to individual customers, and the only credible evidence in the record shows that the sales are consummated in the United States. (Trial Tr. 262; PTX 24).

Accordingly, these "foreign" sales fall within the purview of American patent law, and ResQNet is entitled to receive a royalty on them.

The final area of dispute with regard to damages pertains to the maintenance fees charged NewLook customers. Lansa charged each customer who purchased NewLook a surcharge equal to fifteen percent of the NewLook software price as a "maintenance fee" for the first year. (Trial Tr. 265). This first year charge was mandatory, and customers had the choice of whether to renew their maintenance agreement with Lansa each subsequent year, at the same annual rate. (Trial Tr. 265).

46

Typically, 80 percent of customers renewed the maintenance agreement each year. (Trial Tr. 265).

While Lansa does not dispute Dr. David's calculations for NewLook maintenance revenue for fiscal years 2005 and 2006, Siniscal testified that the actual figures for fiscal years 2002, 2003, 2004, and 2007 were below Dr. David's estimates.[8] Siniscal testified that maintenance revenue for fiscal year 2002 was $355,000, fiscal year 2003 was $394,000, fiscal year 2004 was $349,000, and fiscal year 2007 was $360,000. (Trial Tr. 268). Lansa introduced no documentary evidence to support this testimony.

Dr. David calculated the maintenance revenue for fiscal years 2002 through 2004 by multiplying estimated NewLook software sales revenue for each year by 1.553, the ratio of maintenance to software revenue for April 2004 through November 2006. (Revised David Report, at 2). While the Court accepts Dr. David's estimates for software sales, Dr. David's methodology for determining early maintenance revenues was fundamentally flawed and biased toward obtaining a higher number.

---

[8] As noted above, only revenues earned after the '075 Patent's operative date of September 25, 2001 are relevant for damages calculations.

47

As Dr. David testified, the NewLook maintenance fee is "cumulative over time": as software is sold each year, the growth rate of maintenance revenue would be expected to outstrip the growth in software sales revenues. (Trial Tr. 45). Accordingly, as NewLook software sales dropped from an estimated $725,000 in 2002 to as low as $176,392 in 2005, the relative size of maintenance revenue would be expected to grow as a matter of pure mathematics, absent a sea change in maintenance renewals. Simply applying the ratio of software-to-maintenance revenues for the low-sales years of 2005 through 2007 to the prior, much more successful years of 2002 through 2004 would likely substantially overstate maintenance revenues.

Though uncorroborated by any documentary evidence in the record, Siniscal's testimony therefore represents the strongest evidence of the maintenance fee revenues for fiscal years 2002 through 2004.[9]

---

[9] David's estimate for maintenance revenue for fiscal year 2007 represents an extrapolation from the first eight months of that year. Because this calculation does not suffer from the same flaws as David's 2002 through 2004 estimates, the Court will adopt David's estimate.

48

Thus, Lansa's maintenance revenue for the period from September 25, 2001 through March 31, 2007 was $2,124,029.[10] The total revenue to which the reasonable royalty should be applied is $4,017,899, resulting in a damages award of $502,237 through March 31, 2007.

*B. Lansa's Infringement of the '075 Patent was not Willful*

Under 35 U.S.C. § 284, a court finding infringement may award enhanced damages up to three times the amount of actual damages. In the absence of statutory standards, the Federal Circuit has held that such damages are appropriate upon "a showing of willful infringement." In re Seagate Tech., LLC, 497 F.3d 1360, 1368 (Fed. Cir. 2007) (en banc). The Seagate court heightened the threshold showing required for a finding of willfulness by holding that "proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness." Id. at 1371.

---

[10] This figure is derived from Exhibit 4 to the Revised David Report for fiscal years 2005 through 2007, and Siniscal's testimony for fiscal years 2002 through 2004. The fiscal year 2002 number was multiplied by the fraction (177/365), to account for the fact that Lansa's fiscal year begins in April of the previous calendar year. (Revised David Report, Ex. 4; Trial Tr. 268).

49

First, the patentee bears the burden of demonstrating by clear and convincing evidence "the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." Id. The infringer's state of mind is not relevant to this initial objective inquiry. See id. If the objective component has been satisfied, the analysis shifts to the subjective knowledge of the infringer: the patentee must then demonstrate that "this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." Id.

Here, the evidence does not support a finding of objective recklessness on the part of Lansa. While Lansa was ultimately unsuccessful in defending against infringement or proving invalidity with regard to the '075 Patent, its arguments in these areas were substantial, reasonable, and far from the sort of easily-dismissed claims that an objectively reckless infringer would be forced to rely upon. Despite submitting a supplemental brief addressing the Seagate decision, ResQNet has pointed to no evidence of objective recklessness, but instead relied only on subjective evidence. (Pl. Response to Lansa's Submission of Supplemental Authority, at 5). Accordingly,

ResQNet has failed to establish willful infringement of the '075 Patent.

*C. ResQNet is Not Entitled to an Injunction*

A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, which must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S.Ct. 1837, 1839, 1841 (2006).

ResQNet has made no showing to establish any of the four factors for a permanent injunction. There is no evidence that any injury to ResQNet by sales of NewLook is irreparable.

There is no showing that remedies at law are insufficient or that a remedy in equity is warranted given the balance of hardships. Accordingly, the issuance of an injunction is not appropriate.

## Sanctions

The Court previously awarded Rule 11 sanctions against ResQNet and its counsel, in an amount to be determined after trial. See ResQNet III, 382 F. Supp. 2d at 457. A court has significant discretion in determining what sanction should be imposed for a Rule 11 violation. See Rule 11 Advisory Committee Note.

Factors to be considered in determining an appropriate sanction, cited by both parties, include:

(1) The good faith or bad faith of the offender;

(2) The degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense;

(3) The knowledge, experience and expertise of the offender;

(4) Any prior history of sanctionable conduct on the part of the offender;

(5) The reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct;

(6) The nature and extent of the prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct;

(7) The relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area;

(8) The risk of chilling the specific type of litigation involved;

(9) The impact of the sanction on the offender, including the offender's ability to pay a monetary sanction;

(10) The impact of the sanction on the offended party, including the offended person's need for compensation;

(11) The relative magnitude of sanction necessary to achieve the goal or goals of the sanction;

(12) Burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs;

(13) The degree to which the offended person attempted to mitigate any prejudice suffered by him or her;

(14) The degree to which the offended person's own behavior caused the expenses for which recovery is sought;

(15) The extent to which the offender persisted in advancing a position while on notice that the position was not well grounded in fact or warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and

(16) The time of, and circumstances surrounding, any voluntary withdrawal of a pleading, motion or other paper.

In re Omega Trust, 120 B.R. 265, 270-271 (S.D.N.Y. 1990).

The conduct for which sanctions were awarded was ResQNet's "filing an amended complaint containing claims with regard to the '127 Patent and the '608 Patent after having expressly determined that the prior belief of infringement of those patents had been incorrect and in the absence of any intervening developments from which a good faith basis to bring the claims might be inferred." ResQNet III, 382 F. Supp. 2d at 457. On September 25, 2001, ResQNet represented to Lansa that it would remove those patents from this litigation, yet its Amended Complaint, filed on December 4, 2001, asserted infringement of these two patents. See id. at 455. ResQNet informally withdrew the '127 Patent infringement claim prior to June 2002, and formally withdrew all infringement claims when it stipulated to the consent judgment on November 5, 2002. See id.

Thus, for almost a year Lansa was faced with defending against claims that ResQNet had already determined to be meritless.

ResQNet's voluntary withdrawal of the two patents at issue, the lack of prior history of sanctionable conduct, and the risk of chilling candid settlement discussions must be balanced against the threat imposed by the amended complaint, its economic effect, and the costs presumably incurred during this period. Under these circumstances, an award of $100,000 is appropriate.

**Conclusion**

For the reasons stated above, judgment will be entered in favor of the Plaintiff with regard to the '075 Patent and the Defendant with regard to the '608 Patent.

Damages in the amount of $402,237 (net of the $100,000 sanction) are awarded to ResQNet. Lansa shall provide ResQNet with data indicating its NewLook software sales and maintenance fee revenues since March 31, 2007 to which the reasonable royalty rate of 12.5% shall be applied. Submit judgment on notice.

It is so ordered.

**New York, NY**
**February /   , 2008**

/ROBERT W. SWEET
U.S.D.J.