# ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

RESQNET.COM, INC.,

                      Plaintiff,

    - against -

LANSA, INC.,

                      Defendant.

------------------------------------------X

301099

01 Civ. 3578 (RWS)

OPINION

12-6-11

A P P E A R A N C E S:

Attorney for Plaintiff

SORIN ROYER COOPER LLP
Two Tower Center Boulevard, 11th Floor
East Brunswick, N.J.   08816
By:   Jeffrey Kaplan, Esq.

Attorneys for Defendant

ARENT FOX LLP
1675 Broadway
New York, N.Y.   10019
By:   David Wynn, Esq.

1050 Connecticut Avenue, NW
Washington, D.C. 20036
By:   James Hulme, Esq.
      Janine Carlan, Esq.
      Taniel Anderson, Esq.

**Sweet, D.J.**

Following the Federal Circuit's decision in this patent infringement action vacating this Court's original damages award and remanding for redetermination of damages, as set forth below, an award of $164,265 prior to prejudgment interest is entered.

## Prior Proceedings

The relevant facts and history of this proceeding are set forth in detail in the Court's earlier Opinions. See ResQNet.com, Inc. v. Lansa, Inc., No. 01 Civ. 3578 (RWS), 2008 WL 4376367 (S.D.N.Y. 2008); ResQNet.com, Inc. v. Lansa, Inc., 533 F. Supp. 2d 397 (S.D.N.Y. 2008); ResQNet.com, Inc. v. Lansa, Inc., 382 F. Supp. 2d 424 (S.D.N.Y. 2005); ResQNet.com, Inc. v. Lansa, Inc., No. 01 Civ. 3578 (RWS), 2002 WL 310028011 (S.D.N.Y. Sept. 5, 2002). Familiarity with those facts is assumed.

Of relevance here, in these prior proceedings this Court ruled that U.S. Patent No. 6,295,075 (the "'075 patent"), owned by plaintiff ResQNet.com ("Plaintiff" or "ResQNet"), is valid and infringed by defendant Lansa, Inc. ("Defendant" or "Lansa"). The Court awarded damages of $506,305 for past

1

infringement based on a hypothetical royalty of 12.5%, plus prejudgment interest, and imposed a license at the same rate for future activity covered by the '075 patent. The Court additionally assessed Rule 11 sanctions against ResQNet and its counsel.

On February 5, 2010, the Federal Circuit affirmed this Court's rulings on the issues of validity and infringement, reversed the imposition of sanctions against ResQNet, vacated the damages award, and remanded "for a recalculation of a reasonable royalty." ResQNet.com, Inc. v. Lansa, Inc., 594 F.3d 860, 873 (Fed. Cir. 2010). The Federal Circuit found that ResQNet failed "to persuade the court with legally sufficient evidence regarding an appropriate reasonable royalty." Id. at 872. Specifically, the Circuit found that ResQNet's expert witness, Dr. David, and in turn this Court, impermissibly relied on re-branding and re-bundling licenses that furnished finished software products, source code, and other services. Id.

A hearing on the appropriate reasonable royalty was held on June 7 and 8, 2011 and final argument was heard on September 19, 2011.

**Discussion**

**I.  Legal Standard**

Upon a showing of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284.  The infringed party bears the burden of proof to persuade the court with legally sufficient evidence regarding an appropriate reasonably royalty. See, e.g., Lucent Techs., Inc. v. Gateway, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  "A reasonable royalty is, of course, "'merely the floor below which damages shall not fall.'" Id. (quoting Bandag, Inc. v. Gerrard Tire Co., 704 F.2d 1578, 1583 (Fed.Cir. 1983)).

The damages analysis must concentrate on compensation for the economic harm caused by the infringement, and proof of damages must be tied to sound economic proof. See, e.g., Grain Processing Corp. v. American Maize-Prods. Co., 185 F.3d 1341, 1350 (Fed. Cir. 1999); Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1312 (Fed. Cir. 2002).

3

The more common approach of determining damages attempts to ascertain the royalty rate to which the parties would have agreed had they negotiated an agreement prior to infringement. See, e.g., Unisplay, S.A. v. American Elec. Sign Co., Inc., 69 F.3d 512, 517 (Fed.Cir. 1995). "The hypothetical negotiation tries, as best as possible, to recreate the ex ante licensing negotiation scenario and to describe the resulting agreement . . . . The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed." Lucent, 580 F.3d at 1324. In calculating a reasonable royalty under this approach, courts rely on the comprehensive, if overlapping, list of fifteen factors detailed in Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), often termed the "Georgia-Pacific factors."

The first Georgia-Pacific factor requires considering past and present royalties received by the patentee "for the licensing of the patent in suit, proving or tending to prove an established royalty." 318 F.Supp. at 1120. "[T]his factor considers only past and present licenses to the actual patent and the actual claims in litigation." ResQNet.com, 594 F.3d at 869 (citing Lucent, 580 F.3d at 1329). Thus, the damages calculation may not rely on licenses that are "radically

4

different from the hypothetical agreement under consideration." Lucent, 580 F.3d at 1327-28.

In addition, the hypothetical negotiation must be assumed to have occurred prior to litigation over the patent because the threat of suit may skew a fee's negotiation, see Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078-79 (Fed. Cir. 1983), and established royalty rates are therefore evaluated in this light. Similarly, a reasonable royalty can be different than an established royalty when widespread infringement artificially depressed past licenses. See, e.g., Nickson Indus., Inc. v. Rol Mfg. Co., 847 F.2d 795, 798 (Fed. Cir. 1988).

The second Georgia Pacific factor considers "the rates paid by the licensee for the use of other patents comparable to the patents in suit." Georgia Pacific 318 F.Supp. at 1120. The third factor weighs "[t]he nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted." Id. The fourth Georgia-Pacific factor concerns the licensor's policies and practices regarding the grant of licenses to its technology. Id. The fifth addresses the commercial relationship between the licensor and the licensee. Id. The sixth factor is "[t]he effect of selling the patented specialty

in promoting sales of other products of the license; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative convoyed sales." Id.

The seventh factor is the duration of the patent and term of the license. Id. The eighth, "[t]he established profitability of the product made under the patent; its commercial success; and its current popularity." Id. The ninth factor is "[t]he utility and advantage of the patent property over the old modes or devices, if any that has been used for working out similar results." The tenth concerns the nature of the patented invention as well as its commercial embodiments and benefits. Id. The eleventh factor is the extent the infringer used invention and evidence of the value of that use. Id.

The twelfth Georgia-Pacific factor is directed to the customary profit for use of the invention or analogous inventions. Id. The thirteenth is the portion of the infringer's profit that should be credited to the invention. Id. The fourteenth factor considers the opinion of qualified experts. And the final factor is the amount that a licensor and a licensee would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement. Id.

Finally, a reasonable royalty may also reflect "[t]he fact that an infringer had to be ordered by a court to pay damages, rather than agreeing to a reasonable royalty." Maxwell v. J. Baker, Inc., 86 F.3d 1098, 1109-10 (Fed. Cir. 1996).

## II. Reasonable Royalty

As detailed below, the evidence presented at the June 7-8, 2011 hearing establishes that the proper royalty to be awarded is three percent and that such royalty should be applied to all sales revenue, including maintenance fees, from September 25, 2001 through June 24, 2008.

## A.  Royalty Rate

With respect to the royalty rate that should apply, ResQNet offered the testimony and a second expert report of Dr. Jesse David, a senior consultant at the National Economic Research Associates who holds a Ph.D. in Economics from Stanford University.  Lansa offered the expert testimony and report of Brian Blonder, a managing director of FTI Consulting and head of its District of Columbia intellectual property damages and evaluation practice.

7

Each party's expert provided a thorough analysis and report, applying each of the Georgia-Pacific factors. (Pl. Ex. C (David Report of Sept. 29, 2010)[1]; Def. Ex. 105 (Blonder Report)). The parties agreed that of the fifteen factors, six are neutral (factors two, three, six, seven, twelve, and thirteen). The Court is in agreement and as such will not address those factors here. Likewise, neither expert addressed factor fourteen, the opinion of experts, or found the final factor fifteen to otherwise impact their previous conclusions.

Of the remaining factors, the central one driving both experts' conclusions was the first, which addresses the past and present royalties received by the patentee for the licensing of the patent in suit. Under the Circuit's holding, only straight licenses of the patent at issue may be considered, and not re-bundling licenses. ResQNet.com, 594 F.3d 872. The parties agree that while there are three such licenses, the only relevant licenses to consider are the IBM and Zephyr licenses.[2] Of note, the Zephyr agreement was reached to settle litigation, while the IBM agreement was not.

---

[1]    This is David's second report, submitted subsequent to the appeal and remand.
[2]    The terms of both licenses are subject to a protective order. The evidence submitted under protective order supports the reasonable royalty calculated here.

8

David concluded that an appropriate reasonable royalty rate was eight to ten percent. (Pl. Ex. C at 16 ("David Report")). David based this estimate in large part on the royalties ResQNet received in these two straight licenses. (Pl. Ex. C at 4-8). Of note, to reach this conclusion, David scaled one of the rates, based on the language of that license as well as interviews with ResQNet employees who negotiated it. (Pl. Ex. C at 5; Tr. 91-98; Pl. Ex. S, T.) Lansa contends that this scaling is inappropriate because it relies on extrinsic evidence. This is incorrect. The license in question makes clear that the given royalty rate applies to a larger body of revenue than that which would have been produced by the licensed patents alone, leaving no doubt that the appropriate royalty rate for the several ResQNet patents should be scaled upward from the license's lower rate on a greater body of revenue (Def. Ex. 112, Def. Ex. 113 at 4, 6, 19, 25.) In this regard, David's estimate of the appropriate scaling is unrebutted. As discussed below, however, David failed to adequately apportion for the multiple patents that license entailed.

Lansa's expert Blonder argues that based in part upon these two straight licenses, a royalty rate of one percent of revenues including maintenance, or 1.5% of revenues excluding

maintenance, is reasonable.   In support of this conclusion, Blonder divides the rate of each of the two straight licenses, each of which covers a number of patents, by that number.  (Def. Ex. 105 at 13-15.)   This approach assumes that the value of the '075 patent is equal to that of the other licensed components.

In Lucent, the Federal Circuit vacated a royalty rate because the patented technology did not drive demand for the accused product.  Lucent, 580 F.3d at 1336.  "The patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative."  Id. at 1337 (quoting Garretson v. Clark, 111 U.S. 120, 121 (1884)).   There must therefore be a downward rate adjustment to account for and apportion the value of the '075 patent within the context of both of the straight licenses in evidence.

While David noted that the multiple patents included in both straight licenses would have a "downward influence" (Tr. 90) he did not adequately apportion the straight licenses. Blonder simply divided their rates by the number of patents that the licenses covered.   Both approaches must be rejected:

10

David's because it is counter to the holding of <u>Lucent</u>, which requires a downward and not speculative adjustment, and Blonder's because it is supported by nothing other than its simplicity. Blonder provides no reasoning as to why a straight up division method accurately captures the proper royalty here.

As to factor four, David found that ResQNet's practice of licensing the code for its software products or negotiate re-seller agreements for those products, instead of entering straight patenting licenses, would tend to indicate and upward influence on a royalty rate based on the straight licenses alone. This reasoning would permit reliance on the very bundling licenses that the Circuit rejected. By contrast, Blonder soundly reasoned that because ResQNet has executed three license agreements that implicitly include right to the '075 patented technology, this would operate a neutral or downward influence on the royalty rate of the patent in suit.

Regarding factor five, the commercial relationship between the licensor and licensee, David found that because Lansa and ResQNet were direct competitors, this would tend to have an upward influence on the royalty rate. Blonder found that the companies are not direct competitors because ResQNet typically provides its program to other companies to resell or

11

bundle and, as such, this factor was neutral.   As the evidence produced at trial confirms that ResQNet did in fact generally provide its program to other companies to resell or bundle, Blonder's view is the better one.

With regard to the remaining factors, Blonder found that factors eight through eleven were neutral.   David, analyzing those factors together, found that they had an upward influence.   David reached this conclusion in part by relying on the bundling licenses specifically rejected by the Federal Circuit.   This reliance was improper.   David additionally cited the significant revenues NewLook generated for Lansa, that one of the straight licensees have paid ResQNet royalties for nine years rather than redesign its product, and that the '075 patent has been deemed valid and infringing as upwardly influencing factors.   The Court is in agreement that these latter factors, though not the re-bundling licenses, are mildly upwardly influencing.

Based upon a consideration of all of the <u>Georgia Pacific</u> factors and in light of the Federal Circuit's opinion, a three percent royalty rate is reasonable here.

**B.  Royalty Base**

12

The parties additionally disagree as to what royalty base this rate should be applied.  Specifically, the parties are at odds over whether the rate should apply to a base that does or does not include maintenance fees.  ResQNet argues that maintenance fees were included in the Court's original decision and should be included here, while Lansa asserts that the inclusion of maintenance fees is inappropriate.

ResQNet has the better view.  In the original trial in 2007, both parties presented evidence and argument as to the royalty base to which the reasonable royalty rate should be applied.  See ResQNet.com, 533 F. Supp. 2d at 418-19 ("Dr. David calculated Lansa's revenue from NewLook sales . . . with associated maintenance fee revenue . . . . While Lansa does not dispute Dr. David's calculations for NewLook maintenance revenue for fiscal years 2005 and 2006 [Lansa President John] Siniscal testified that the actual figures for fiscal years 2002, 2003, 2004, and 2007 were below Dr. David's estimates.")  In the course of those proceedings, Lansa did not object to the Court's inclusion of maintenance revenue in the royalty base, only the appropriate amount of maintenance revenue to which the royalty rate should be applied.

13

This Court's opinion of February 1, 2008 found that the proper royalty base included maintenance fees, holding that "Lansa shall provide Resqnet with data indicating its Newlook software sales and maintenance fee revenue since March 31, 2007 to which the reasonable royalty rate of 12.5% shall be applied." Id. at 419-22. Lansa did not challenge the scope of the royalty base on appeal or question the inclusion of maintenance revenue in the base in its briefing before that court.

The mandate rule bars relitiation not only of issues actually decided on appeal, but of issues that "fall within the scope of the judgment appealed from . . . but not raised." Amado v. Microsoft Corp., 517 F.3d 1353 (Fed. Cir. 2008). Here, the Circuit affirmed this Court's finding with regard to infringement on all sales, which included maintenance fees. As such, the amount of the royalty base is therefore not now before this court and maintenance fees must be included in the royalty base. See, e.g., id. (party that did not challenge stayed injunction in appeal could not challenge it on remand); Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 576 F.3d 1348, 1355-57 (Fed. Cir. 2009) (invalidity could not be asserted on remand for trail on infringement and damages); Meacham v. Knolls Atomic Power Lab., 2009 WL 4912205 (2d Cir. 2009) (issue of waiver

14

could not be addressed on remand because appeal adjudicated
merits and waiver is antecedent to any analysis on the merits).

Notwithstanding, on the merits, all sales revenue,
including maintenance fees, should be included in the royalty
base.

Lansa argues that maintenance fees should not be
included in the royalty base because, in Defendant's view,
neither of the straight patent licenses included maintenance
fees.  With regard to the IBM license, the parties point to an
advertisement that was taken from IBM's website in 2011, which
provides:  "IBM Passport Advantage and Passport Advantage
Express include renewable Software Maintenance that complements
your IBM software purchases.  With each license acquisition, you
receive the product upgrade and support features of Software
Maintenance.  Whereas some vendors provide the option to
purchase these separately . . . IBM believes its customers
increase their return on investment (ROI) through this package
deal."  (Def. Ex. 114.)  At the threshold, little weight can be
given the 2011 advertisement language because it is not clear to
what degree if any bearing it has on IBM's practices in 2001.
With respect to the advertisement, Lansa presented the testimony
of Brandon Kay, who testified that this language means that

15

after an IBM customer purchases a license for a software application, they can purchase an additional license for product upgrade and maintenance, rather than purchasing each separately. (TR. 256-57.)   In opposition, ResQNet provided the testimony of Gad Janay, who testified that "basic maintenance and support was included in the product price and upgrades. Either you bought upgrade protection or you had to pay for a new license when you wanted to upgrade." (Tr. 260-61.)   Even if a separate license was required for product upgrades and that license includes maintenance fees, IBM was paying royalties to ResQNet on upgrade licenses.   (Def. Ex. 113 at 25)   Thus, some if not all IBM maintenance and upgrade services was royalty bearing.

In contrast, the Zephyr settlement expressly excluded maintenance fees.  (Tr. 100-01, 112-15, Def. Ex. 52 at ZEP 212). In addition, Lansa introduced an advertisement, which states "[a] Zephyr Subscription License Plan (SLP) includes the software license, [and] all maintenance. . . . If you require less than 100 unites, we can offer a traditional purchase (perpetual) option." (Def. Ex. 115.)  Accordingly, the value of maintenance would have been included in the net sales price of subscriptions, upon which Zephyr was paying royalties. (Pl. Ex. E at 2.)   However, the Zephyr license does not charge for maintenance if it was sold separately in the event a customer

16

did not choose the subscription plan, that is, when less than 100 units was ordered. (Def. Ex. 115.)  Thus, under the Zephyr license it appears that some but not all maintenance was royalty bearing.

Moreover, one year of maintenance, charged at 15% of the purchase price of the software, is required to be purchased when NewLook is first ordered. ResQNet.com, 533 F. Supp. 2d at 419.  Maintenance fees typically include delivering an updated version of the same, and here infringing, software and as such is a basis for customer demand for updates.  (See Def. Ex. 115 at 1 (noting that customer gets new version of the software in exchange for maintenance fees); Def. Ex. 114 at 2 (stating that maintenance gives customers the right to "upgrade at your leisure, conveniently downloading new software from the Web")).

In sum, while the issue of maintenance fees is not properly before the Court, were it to reach the issue, maintenance fees should be included in the royalty base.

The parties are in agreement that the total revenue base, including maintenance fees, from September 25, 2001 to June 24, 2008 is $5,475,512.  (Def. Ex. 105 at Schedule 1A (Blonder); Pl. Ex. C at Appendix 2B (David).)

17

**C. Damages Are Awarded From September 25, 2001 to June 24, 2008**

In addition to the appropriate royalty rate and base, the parties disagree on the proper period over which damages should be calculated.

Lansa argues that on June 24, 2008, NewLook was redesigned. (Tr. 247; Def. Ex. 108 at 2.) Lansa alleges that these changes amount to an effective design around and as such damages are only appropriate through June 24, 2008. With regard to whether the allegedly new product infringes, "the modifying party generally deserves the opportunity to litigate the infringement question at a new trial." Arbeck Mgf., Inc. v. Moazzam, 55 F.3d 1567 (Fed. Cir. 1995); see also Medtronic Vascular v. Boston Scientific Corp., 2009 WL 175696 (E.D. Tex. Jan. 23, 2009) (severing pre-verdict infringement from continuing claims in order to enter final judgment); Eagle Comtronics, Inc. v. John Mezzalingua Assocs., Inc., 198 F.R.D. 351, 354 (N.D.N.Y. 2000) (refusing to reach issue of redesign when not properly presented). This conclusion is not altered by the Federal Circuit's recent opinion in Tivo Inc. v. EchoStar Corp., 646 F.3d 869 (Fed. Cir. 2011), which addressed the legal standards applicable to and procedural requirements for analyzing a redesign in the context of contempt proceedings

18

under an injunction enforcing patent rights.   That case is distinct from the unique context of a remand for a calculation of damages as to the established infringement, and in absence of a previously issued injunction, that is presented here. Additionally, insufficient evidence as to whether or not the "new" NewLook infringes the '075 patent has been presented to the Court.   No technical expert has been offered.   Nor have the parties or their experts assessed what damages might be appropriate in the context of a new hypothetical negotiation following the redesign in 2008.   See Applied Medical Resources Corp. v. U.S. Surgical Corp., 435 F.3d 1356 (Fed. Cir. 2006) ("Because the determination of reasonable royalty damages is tied to the infringement being redressed, a separate infringement beginning at a different time requires a separate evaluation of reasonable royalty damages.").   Thus, if ResQNet chooses to pursue an infringement claim against the redesigned NewLook, it must do so in a separate action.

Damages are therefore awarded for the period of September 25, 2001 to June 24, 2008.

19

## Conclusion

For the reasons set forth above, a damages award in the amount of three percent on a royalty base of $5,475,512 is entered, for a total of $164,265 prior to prejudgment interest. Submit judgment on notice.

It is so ordered.

New York, NY
December 5, 2010
2011

ROBERT W. SWEET
U.S.D.J.

20